## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN

COLLEEN MURRAY,

      Plaintiff,

vs.

CITIMORTGAGE INC., and
EQUIFAX INFORMATION SERVICES, LLC,

      Defendants.

ADAM S. ALEXANDER (P53584)
ANDREW R. MIKOS (P76268)
Counsel for Plaintiffs
17200 W 10 Mile Rd, Ste. 200
Southfield, MI 48075
(248) 246-6353
adalesq@gmail.com

### PLAINTIFF'S COMPLAINT & JURY DEMAND

#### Introduction

1.      Plaintiff, Colleen Murray, brings this action to secure redress from unlawful mortgage servicing practices and credit reporting violations engaged in by Citimortgage Inc.

#### Jurisdiction

2.      Plaintiff is a consumer as defined by the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq ("FCRA") at §1681a(c).

3.      Plaintiff resides in Lansing, Michigan.

4.      Defendant Citimortgage, Inc., ("Citimortgage" or "Defendant"), is a mortgage bank and servicing company doing business in Ingham County, Michigan.

5.      Defendant Equifax Information Services, LLC ("Equifax") is a Georgia company that maintains a registered agent in Ingham County, Michigan.

6.      Citimortgage is a furnisher of information as contemplated by the Fair Credit Reporting Act ("FCRA") 15 U.S.C. §1681s 2(a) & (b), that regularly and in the ordinary course of business furnishes information to one or more consumer reporting agencies about consumer transactions or experiences with any consumer.

7.      Plaintiff is a consumer as defined by the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq ("FCRA") at 1681a(c).

8.      This court has pendant jurisdiction over the state law claims alleged herein, and has concurrent jurisdiction over the federal law claims, and the action is otherwise in the proper court.

9.      This Court is the proper venue as the acts giving rise to this Complaint occurred in this district.

10.     Plaintiff seeks damages as outlined below and attains proper jurisdiction in connection with the FCRA.

## General Allegations

11.     Plaintiff and Citimortgage or its predecessors entered into a Mortgage and Home Loan for the residence located at 704 Maplehill Avenue in Lansing, Michigan.

12.     On April 20, 2005, Plaintiff filed for Chapter 13 bankruptcy.

13.     Plaintiff's plan was confirmed on June 8, 2005.

14.     Plaintiff's case was completed on August 27, 2010.

2

15.    As part of Plaintiff's exit from Chapter 13 bankruptcy protections, she was to begin making monthly mortgage payments on her account #0612077750, (Account"), beginning November 1, 2010 in accordance with the plan set forth by the trustee.

16.    Any arrearages prior to that date should have been properly set aside in accordance with Plaintiff's Chapter 13 bankruptcy.

17.    On October 20, 2010, Plaintiff contacted Defendant to determine the process for resuming direct payments to Citimortgage.  At that time, a company representative claimed that payments had not been received on the account for the months of July, August, September, and October 2010.

18.    Though she had not received any monthly mortgage statements, Plaintiff began making monthly mortgage payments on the Account on November 1, 2010.

19.    As she had not received any invoices from Citimortgage, Plaintiff sent a copy of the document from the Trustee indicating the commencement of mortgage payments, her most recent Escrow Statement (dated March 19, 2010), and instructions to associate her November 1, 2010 payment for that month to CitiMortgage, Inc. along with the payment.

20.    On December 6, 2010, Plaintiff's bankruptcy case was discharged.

21.    Though Plaintiff had complied with her Chapter 13 bankruptcy plan and had sent payments monthly starting November 2010, Citimortgage sent a letter to Plaintiff dated February 1, 2011, expressing that her mortgage payments for the months of November 2010 and February 2011 were past due putting her loan in default.  This was incorrect given Plaintiff's timely payments during those months.

22.     Defendant continued to send erroneous default letters, demand letters and payment shortage letters, despite Plaintiff's on time payments in accordance with the monthly invoices that she received and in conformance with the mortgage agreement between the parties.

23.     Though Plaintiff made timely payments each month, and had received letters from Defendant claiming payment shortages and default notices, it was not until June 20, 2011 that she actually received a monthly statement from Citimortgage after the resumption of direct payments in November 2010.

24.     Plaintiff sent a qualified written request to Citimortgage on July 19, 2011, which included name, loan number, and the property address.  In this qualified written request, Plaintiff requested a breakdown of pre-bankruptcy and post-bankruptcy information.

25.     CitiMortgage received a copy of the qualified written request.

26.     On November 8, 2011, Citimortgage offered its response to Plaintiff's July 2011 qualified written request.  This response letter explicitly admitted and acknowledged that Plaintiff's account was paid and current through November 11, 2011, despite the multiple letters from Defendant that had been sent between February 2011 and October 2011 claiming late payments and/or a failure to make the correct payment.  (**Exhibit A**).

27.     Though Citimortgage acknowledged Plaintiff was current with her mortgage through November 2011, and though Plaintiff continued to pay her mortgage on time and in full thereafter, Citimortgage once again began sending default letters,

demands for payment, late payments notices, and/or payment overdue letters to Plaintiff, in error.

28.     In response to these incorrect, stressful and harassing letters, on August 9, 2013, Plaintiff once again sent a qualified written request to Citimortgage, which included her name, loan number, and the property address.  The qualified written request indicated a statement of the reason for the belief that there was an error and requested in sufficient detail that Citimortgage provide specific information so that Plaintiff could determine the exact nature of the disputed items alleged late payments.

29.     Citimortgage received a copy of the qualified written request.

30.     Despite its receipt of the qualified written request, Defendant refused to adequately explain the reason it deemed Plaintiff's payments late and continues to attempt to collect money and fees not owed by Plaintiff.

31.     After several fruitless years of attempting to correct her account informally, and to get an explanation of why Citimortgage has deemed the account in default or late, Plaintiff has finally been forced to file this lawsuit to correct the errors.

32.     Plaintiff has suffered from emotional distress as the result of this longstanding showdown with Citimortgage, including loss of sleep, anxiety, loss of productivity, humiliation, embarrassment and other manifestations of emotional distress.

33.     In addition to failing to correct the Account statements, Citimortgage reported inaccurate information to at least two of the three major credit bureaus, Equifax and Transunion.

34.     In July of 2014 Plaintiff reviewed her credit reports and discovered Equifax and Transunion was reporting multiple lates relating to the Account which were not correct, and that Equifax was reporting 30-day lates which were not accurate.

35.     In response Ms. Murray disputed the Citimortgage trade line by sending a certified letter to both Equifax and Transunion, disputing the above referenced inaccurate and derogatory trade line with adequate description and explanation as to why the account was reported in error.  (See Equifax letter - **Exhibit B**).

36.     In response to Plaintiff's dispute with Transunion, Transunion deleted the trade line.

37.     Defendant Equifax received the above-referenced dispute and violated the law in response to these disputes as summarized below.

38.     Citimortgage received the disputes from the credit bureaus and then wrongly verified the inaccurate information with Equifax.

39.     As a result of the negative and inaccurate credit reporting, Plaintiff's credit score was adversely affected and Plaintiff 's credit reputation was and is wrongfully damaged.

40.     Defendants were required to conduct a reinvestigation into this specific account on Plaintiff's consumer report pursuant to 15 U.S.C. §1681i.

41.     Citimortgage failed to conduct a reasonable investigation and wrongly verified inaccurate information in connection with Plaintiff's credit reports.

42.     Citimortgage failed to maintain reasonable procedures to assure the maximum possible accuracy of Plaintiff's credit report.

43.     The false information was and continues to be furnished by Citimortgage.

44.     Citimortgage failed to reasonably reinvestigate under 15 U.S.C. § 1681s 2(b) and this failure was willful, and wrongly verified the inaccurate information.

45.     As a result of Citimortgage's willful failure to abide by 15 U.S.C. § 1681s 2(b), Plaintiff has suffered and continues to suffer monetary damages and inability to procure credit at a favorable and reasonable rate in comparison to what she would otherwise qualify for.  She has also suffered damage to her credit reputation, attorney fees and costs.

46.     Plaintiff seeks equitable damages, including correction or deletion of the subject trade line from Plaintiff's credit reports, along with money damages, both actual and statutory, in whatever amount the jury finds Defendants liable plus attorney fees, litigation costs and court costs, and the claims are otherwise within the jurisdiction of this Court.

47.     Defendants Equifax violated the law as detailed below.

### Count I - Breach of Contract

48.     Plaintiffs incorporate the preceding allegations by reference.

49.     There is a valid and binding contract between the parties, i.e. the Mortgage, dated October 16, 2000.  (See **Exhibit C**).

50.     Paragraphs 1 through 5 of the Uniform Covenants beginning on page 4 of the Mortgage set forth the manner in which the original mortgagor and any servicer such as Citimortgage are authorized by the contract to bill Plaintiff for principal, interest, taxes, and insurance, to utilize the funds to pay the taxes and insurance, to apply payments, to apply and manage escrow payments and to manage and apply property insurance, among other provisions.

51.     Citimortgage, by failing to properly apply payments, and failure to manage and apply escrow and insurance payments, illegally caused the balance on the loan to become excessive and incorrect.

52.     Because of Citimortgage's actions, Plaintiff has been damaged because she is now responsible for an inflated and incorrect mortgage balance, along with excessive fees and penalties which are not supported by the contract or by reason.

53.     Citimortgage violated the mortgage contract and promissory note contract by failing or refusing to apply plaintiff's payments in accordance with the agreement and charging fees not permitted by the contracts.

54.     Citimortgage violated the loan agreement by charging Plaintiff late fees that were 5% of the payment when the agreement explicitly states that any late fees will constitute 4% of the payment.

55.     Citimortgage acted in bad faith.

56.     A covenant of good faith and fair dealing exists in every valid Michigan contract, including notes and mortgages pertaining to real property such as the note and mortgage pertaining to Plaintiffs' property.

57.     A breach of the covenant of good faith and fair dealing is a breach of the underlying contract.

58.     Citimortgage failed to perform its duty of good faith and fair dealing with respect to Plaintiff by failing to correctly apply payments, thereby causing excessive fees to accrue, and/or by engaging in negligent accounting and billing practices.

59.     Citimortgage breach of its duty to act in good faith and deal fairly with Plaintiffs, thus breaching the Note and Mortgage.

60.     Plaintiffs also suffered actual damages and are threatened with additional harm from Citimortgage's breach.

61.     To the extent that actual damages will not fully and fairly compensate Plaintiffs, Plaintiffs are entitled to specific performance and other appropriate injunctive relief, including but not limited to an accounting, and correction of the erroneous billing practices moving forward.

62.     Plaintiff incorporates the preceding allegations by reference.

63.     As a result of the breaches of contact, Plaintiff suffered damages, including increased payments, fees, interest and costs, and emotional distress, and will continue to suffer monetary damages due to Defendant's breach of contract.

## COUNT II – FAIR CREDIT REPORTING ACT – CITIMORTGAGE

64.     Plaintiff incorporates the preceding allegations by reference.

65.     Citimortgage was required under 15 U.S.C. § 1681s 2(b), to respond to the request for reinvestigation initiated by Plaintiff through one or more credit reporting agencies by completing an inquiry into the facts underlying the trade line and providing accurate information to the credit reporting agencies regarding that trade line.

66.     In the event that Citimortgage was unable to verify the information, which it had reported, they were required to advise the credit reporting agency of this fact.

67.     Following the reinvestigation, Citimortgage reported the erroneous credit information with actual knowledge of errors, in violation of the FCRA, 15 U.S.C. § 1681s 2(b).

68.    Following the reinvestigation, Citimortgage reported the erroneous credit information and consciously avoided knowing that the credit information was inaccurate, in violation of the FCRA, 15 U.S.C. § 1681s 2(b).

36.    Following the reinvestigation and dispatch of notice directly to Citimortgage, reported credit information that was not in fact accurate, in violation of the FCRA, 15 U.S.C. § 1681s 2(b).

69.    Citimortgage willfully refused to properly to put in place adequate procedures to reinvestigate the inaccuracies in Plaintiff's credit report in violation of 15 U.S.C. §§ 1681s 2(b) and 1681n.

70.    In the alternative, Citimortgage negligently failed to put in place procedures to complete an adequate reinvestigation of disputed credit information in violation of 15 U.S.C. §§ 1681s 2(b) and 168o.

71.    Citimortgage willfully refused to properly reinvestigate the inaccuracies in Plaintiff's credit report in violation of 15 U.S.C. §§ 1681s 2(b) and 1681n.

72.    In the alternative, Citimortgage negligently failed to conduct a proper reinvestigation of Plaintiff's credit reporting dispute in violation of 15 U.S.C. §§ 1681s 2(b) and 168io.

73.    Plaintiff has suffered damages as a result of these violations of the FCRA, in an amount to be determined by the Court.

## COUNT III - VIOLATION OF THE FAIR CREDIT REPORTING ACT BY EQUIFAX

74.    Plaintiff incorporates the preceding allegations by reference.

75.     Defendant Equifax prepared, compiled, issued, assembled, transferred, published and otherwise reproduced consumer reports regarding the plaintiff as that term is defined in 15 USC 1681a.

76.     Such reports contained information about the Plaintiff that was false, misleading and inaccurate.

77.     Equifax willfully refused and failed to maintain and/or follow reasonable procedures to assure maximum possible accuracy of the information it reported to one or more third parties pertaining to the Plaintiff, in violation of 15 USC 1681e(b).

78.     In the alternative, Equifax negligently refused and failed to maintain and/or follow reasonable procedures to assure maximum possible accuracy of the information it reported to one or more third parties pertaining to the Plaintiff, in violation of 15 USC 1681e(b).

79.     After receiving the Plaintiff's consumer dispute to the ERC trade line, Equifax willfully failed to conduct a reasonable reinvestigation as required by 15 U.S.C. 1681i.

80.     Upon information and belief, Equifax did not properly respond to Plaintiff's dispute by sending Plaintiff the results of their investigation.

81.     In the alternative, Equifax negligently failed to conduct a reasonable reinvestigation as required by 15 U.S.C. 1681i.

82.     As a direct and proximate cause of Equifax's negligent failure to perform its duties under the FCRA, the Plaintiff has suffered actual damages, including denial of credit, reduced opportunity for credit, increased costs, interest and fees for credit, along with emotional distress, humiliation and embarrassment.

83.     Equifax is liable to the Plaintiff by reason of its violation of the FCRA in an amount to be determined by the jury together with her reasonable attorneys' fees pursuant to 15 USC 1681o.

WHEREFORE, PLAINTIFF PRAYS that this court grant her a judgment against Equifax for actual damages, costs, interest and attorneys' fees.

## COUNT IV – DEFAMATION

84.     Plaintiff incorporates the preceding allegations by reference.

85.     Defendants caused to be published one or more written false statements which were intended to impeach Plaintiff's honesty, integrity, credit worthiness and/or reputation.

86.     The defamatory statements were, including, but not limited to, the following:

a) That Plaintiff has a delinquent and 30 days late on multiple occasions relating to the Account which is untrue;

87.     Plaintiff is not a public figure.

88.     The statements imputed by Defendants to the public through the three major credit reporting agencies represents a slur on Plaintiff's character by Defendants, including her honesty, integrity, virtue, or reputation, and credit worthiness.

89.     The defamatory statements resulted in damages to Plaintiff.

WHEREFORE, Plaintiff demands judgment against Defendants for injunctive relief and damages in an amount deemed at time of trial to be just, fair, and appropriate.

Accordingly, Plaintiff requests:

## Demand for Judgment for Relief

a. Statutory and actual damages in an amount to be determined by the Court.

b. Deletion or correction of any and all accounts being wrongfully reported to any credit bureau by any Defendants.

c. Statutory costs and attorney fees under the FCRA.

d. Injunctive relief, including, but not limited to, deletion of the account.

e. Compensatory and/or punitive damages, including emotional distress.

f.  Statutory damages in accordance with 15 U.S.C. § 1692k(a)(2)(A);

g.  Statutory costs and attorney fees in accordance with 15 U.S.C. § 1692k(a)(3);

h.  Any other relief, which this Court deems, appropriate.

Respectfully Submitted,

**By:  /s/ Adam S. Alexander**
ADAM S. ALEXANDER (P53584)
ANDREW R. MIKOS (76268)
Attorneys for COLLEEN MURRAY
17200 W. 10 Mile Rd. Ste. 200
Southfield, MI  48075
Phone:(248) 246-6353
Email: adam@alexanderfirm.com

Dated: June 24, 2015

# EXHIBIT

# "A"

CitiMortgage, Inc.          www.citimortgage.com
Research & Litigation
1000 Technology Drive
MS 314 / 3N
O'Fallon, MO 63368

CitiMortgage



November 8, 2011


VIA Regular Mail


COLLEEN MURRAY
704 MAPLEHILL AVE
LANSING MI  48910

Dear CitiMortgage Customer(s):

This letter is in response to an inquiry received in the Default Research and Litigation
Department of CitiMortgage Inc. (CMI) on July 28, 2011.

Below is the response to the inquiry.

With regard to your dispute of the debt, please be advised that the attached Note, Mortgage and
payment history provide verification of the debt.

On April 20, 2005 you petitioned for a Chapter 13 Bankruptcy. CMI records show that case 05-
05560 has been discharged with the court on June 20, 2011. This letter does not in any way
attempt to collect, recover or offset a debt.  This account statement if for informational purposes
only, as this debt may have been included in a Bankruptcy action, or may have been discharged.
This is not an attempt to collect, recover or offset the mortgage indebtedness against you
personally.

As requested, CMI has placed an "In Dispute" comment on your CMI trade line. CMI does not
control or determine credit scoring models or calculations. Therefore, we are unable to provide
information on how or if this dispute code may impact your credit report, FICO, or other credit
scores. If you have further questions regarding this comment appearing on your credit report,
please contact the credit bureau agencies directly.

As of November 8, 2011, your account is paid to 11/01/11.  Please see enclosed Payment
History for all payments and credits posted to the account.

Item 1 through Item 4 - Enclosed please find a payment history for this loan.

Item 5 through Item 6 - Enclosed please find a copy of the Expense and Fee history for this loan.

Item 7 - Enclosed please find a payment history for this loan.

CitiMortgage, Inc. does business as Citicorp Mortgage in NM.

MURRAY
PAGE 2

Item 8 - Enclosed are copies of the two most recent Escrow Analysis Statements completed on your loan. The Analysis completed on 03/19/10 adjusted your payment from $817.80 to $687.64 effective with the 05/01/10 payment. The Analysis completed on 03/29/11 adjusted your monthly payment from $687.64 to $686.12 effective with the 05/01/11 payment.

Item 9 - As of November 8, 2011 there are no monies in the unapplied/suspense account. CitiMortgage uses unapplied/suspense accounts to handle money that is not enough for a payment and the borrower has not advised us how to apply the funds. Enclosed please find a payment history for this loan.

Item 10 - Enclosed please find copy of the Note.

Item 11 - The provision in the Note that allows for late charges on overdue payments is Section 6 A.   If the full amount of the monthly payment is not received by the end of 15 calendars after the date it is due, the amount charged will be 5% of the overdue payment of principal and interest.  Please find a copy of the Note signed by the borrower enclosed with this letter. CitiMortgage does not charge interest on late charges.

Item 12 - This request is outside the scope of information required under the Qualified Written Request provisions of RESPA.

Item 13 - There is no MERS tracking associated with this loan.

Item 14 - This request is outside the scope of information required under the Qualified Written Request provisions of RESPA.

Based on the completed research, CitiMortgage trusts this letter has addressed your concerns on the above loan.  Should you have any further questions, please feel free to contact me directly at 1-800-695-0384* extension 27901, Monday through Friday 8:00am until 4:00pm (CT).  When you call or write to us, please refer to loan number 0612077750.  Thank you.

Sincerely,

Alicia Whitsell
Legal Support Specialist

Enclosure(s)

*Calls are randomly monitored and recorded to ensure quality service.

EXHIBIT "B"

# EXHIBIT

# "B"

*Colleen Murray*
*704 Maplehill Avenue*
*Lansing, MI 48910*

**July 23, 2014**

Complaint Department
Equifax Information Services, LLC
P.O. Box 740256
Atlanta, GA 30374

    *Re: Credit Report Error – (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)*

Dear Sir or Madam:

I am writing to dispute the following information in my file. The items I dispute are also highlighted on the attached copy of the credit report I received.

Mortgage Account – CitiMortgage
Acct# 0612077750-0

1.   The following payments are listed as 30 days late:

      June 2012
      July 2012
      October 2012
      November 2012
      December 2012
      January 2013
      March 2013
      May 2013
      June 2013
      August 2013
      September 2013
      October 2013
      January 2014
      February 2014
      March 2014

2.   Historical Account Information:

    a)  The scheduled payment amount for January 2014 is listed as $736.
    b)  Actual Payment Amounts
    c)  Date of Last Payment
    d)  Amount Past Due

These items (Item #1 above - Payments listed as 30 days late) are inaccurate because each payment was made on time. The terms of my loan provide for a grace period. Payments received on or before the 16th of the month are considered on time. I am requesting that you correct the information to reflect that these payments were made on time.

The Historical Account Information (Item #2a) is inaccurate because the monthly payment amount as January 1, 2014 was lowered to $672.96.

The Historical Account Information (Items #2b, 2c and 2d) are inaccurate because the actual payment amounts and dates differ from what was actually paid and on what date. The amount past due is inaccurate because the payments were made on time each month.

To support my position regarding the payments listed as 30 days late, enclosed are copies of payment receipts and delivery receipts showing the date that CitiMortgage received each payment. I'm also enclosing a copy of my loan documents to support my position regarding the grace period.

To support my position regarding the January 1, 2014 scheduled payment amount, enclosed is a copy of my escrow statement dated November 12, 2013.

To support my position regarding the Actual Payment Amounts, Dates of Last Payment and Amounts past due, enclosed are copies of each payment showing how much was paid and when, along with the delivery receipts. This report only shows payment information through March of 2014, however, I am enclosing my payment receipts to date in case CitiMortgage reports payments received from April 2014 through July 2014 inaccurately as well.

Please re-investigate these matters and correct the disputed items as soon as possible.

If you have any questions about this request or the disputed credit information, you can call me at 517.887.6555.

Sincerely,

Colleen Murray

**Enclosure:**

Copies of the above referenced payments to CitiMortgage

Delivery Receipts

Escrow Statement dated November 12, 2013

Mortgage Loan Documents

**Mailing address:**

**Colleen Murray**
**704 Maplehill Avenue**
**Lansing, MI 48910**

# EXHIBIT

## "C"

UNOFFICIAL COPY



201

Paula Johnson
INGHAM COUNTY
REGISTER OF DEEDS  RECORDED  **L-2872 P-535**
201  17.00  2000-047256

—————————— [Space Above This Line For Recording Data] ——————————

State of Michigan

## MORTGAGE

FHA Case No.
**2633161301-703**

When recorded mail to:
ABN AMRO MORTGAGE GROUP, INC.
P.O. BOX 5064
TROY, MICHIGAN 48084
ATTN:FINAL/TRAILING DOCUMENTS

This instrument prepared by: Beth Pride
ABN AMRO Mortgage Group, Inc.
P.O. Box 5064
Troy, MI 48684

LOAN #: 612077750

2000-047256
Page: 1 of 5
11/06/2000 10:19A

THIS MORTGAGE ("Security Instrument") is given on **OCTOBER 16, 2000.**   The Mortgagor is
**COLLEEN KAY MURRAY, A SINGLE WOMAN AKA COLLEEN K. MURRAY**

whose address is **704 MAPLEHILL
LANSING, MI 48910**
("Borrower").

This Security Instrument is given to **ABN AMRO MORTGAGE GROUP, INC., A DELAWARE CORPORATION**

which is organized and

existing under the laws of **THE STATE OF DELAWARE**
and whose address is **2600 N. BIG BEAVER RD., TROY, MICHIGAN 48084**

("Lender").
Borrower owes Lender the principal sum of **SIXTY SIX THOUSAND NINE HUNDRED FIFTY AND NO/100********
********************************************** Dollars (U.S.  $66,950.00  ).**
This debt is evidenced by Borrower's note dated the same date as this Security Instrument ("Note"), which provides for monthly
payments, with the full debt, if not paid earlier, due and payable on **NOVEMBER 1, 2030.**   This Security
Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and
modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this
Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.
For this purpose, Borrower does hereby mortgage, warrant, grant and convey to the Lender, with power of sale, the following described
property located in **INGHAM**   County, Michigan:

which has the address of **704 MAPLEHILL AVE, LANSING**
[Street, City],

Michigan    **48910**   ("Property Address");
[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and
fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All
of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seized of the estate hereby conveyed and has the right to mortgage, grant
and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend
generally the title to the Property against all claims and demands, subject to any encumbrances of record.   Initials: CKM

FHA Michigan Mortgage - 4/96   Page 1 of 4   MIVFHADE 907

UNOFFICIAL COPY Case 1:15-cv-00663-PLM ECF No. 1 filed 06/24/15 PageID.22 Page 22 of 25

**LOAN #: 612077750**

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

Borrower and Lender covenant and agree as follows:

UNIFORM COVENANTS.

1. **Payment of Principal, Interest and Late Charge.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and late charges due under the Note.

2. **Monthly Payment of Taxes, Insurance and Other Charges.** Borrower shall include in each monthly payment, together with the principal and interest as set forth in the Note and any late charges, a sum for (a) taxes and special assessments levied or to be levied against the Property, (b) leasehold payments or ground rents on the Property, and (c) premiums for insurance required under paragraph 4. In any year in which the Lender must pay a mortgage insurance premium to the Secretary of Housing and Urban Development ("Secretary"), or in any year in which such premium would have been required if Lender still held the Security Instrument, each monthly payment shall also include either: (i) a sum for the annual mortgage insurance premium to be paid by Lender to the Secretary, or (ii) a monthly charge instead of a mortgage insurance premium if this Security Instrument is held by the Secretary, in a reasonable amount to be determined by the Secretary. Except for the monthly charge by the Secretary, these items are called "Escrow Items" and the sums paid to Lender are called "Escrow Funds."

Lender may, at any time, collect and hold amounts for Escrow Items in an aggregate amount not to exceed the maximum amount that may be required for Borrower's escrow account under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. Section 2601 *et seq.* and implementing regulations, 24 CFR Part 3500, as they may be amended from time to time ("RESPA"), except that the cushion or reserve permitted by RESPA for unanticipated disbursements or disbursements before the Borrower's payments are available in the account may not be based on amounts due for the mortgage insurance premium.

If the amounts held by Lender for Escrow Items exceed the amounts permitted to be held by RESPA, Lender shall account to Borrower for the excess funds as required by RESPA. If the amounts of funds held by Lender at any time are not sufficient to pay the Escrow Items when due, Lender may notify the Borrower and require Borrower to make up the shortage as permitted by RESPA.

The Escrow Funds are pledged as additional security for all sums secured by this Security Instrument. If Borrower tenders to Lender the full payment of all such sums, Borrower's account shall be credited with the balance remaining for all installment items (a), (b), and (c) and any mortgage insurance premium installment that Lender has not become obligated to pay to the Secretary, and Lender shall promptly refund any excess funds to Borrower. Immediately prior to a foreclosure sale of the Property or its acquisition by Lender, Borrower's account shall be credited with any balance remaining for all installments for items (a), (b), and (c).

3. **Application of Payments.** All payments under paragraphs 1 and 2 shall be applied by Lender as follows:

First, to the mortgage insurance premium to be paid by Lender to the Secretary or to the monthly charge by the Secretary instead of the monthly mortgage insurance premium;

Second, to any taxes, special assessments, leasehold payments or ground rents, and fire, flood and other hazard insurance premiums, as required;

Third, to interest due under the Note;

Fourth, to amortization of the principal of the Note; and

Fifth, to late charges due under the Note.

4. **Fire, Flood and Other Hazard Insurance.** Borrower shall insure all improvements on the Property, whether now in existence or subsequently erected, against any hazards, casualties, and contingencies, including fire, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. Borrower shall also insure all improvements on the Property, whether now in existence or subsequently erected, against loss by floods to the extent required by the Secretary. All insurance shall be carried with companies approved by Lender. The insurance policies and any renewals shall be held by Lender and shall include loss payable clauses in favor of, and in a form acceptable to, Lender.

In the event of loss, Borrower shall give Lender immediate notice by mail. Lender may make proof of loss if not made promptly by Borrower. Each insurance company concerned is hereby authorized and directed to make payment for such loss directly to Lender, instead of to Borrower and to Lender jointly. All or any part of the insurance proceeds may be applied by Lender, at its option, either (a) to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order in paragraph 3, and then to prepayment of principal, or (b) to the restoration or repair of the damaged Property. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments which are referred to in paragraph 2, or change the amount of such payments. Any excess insurance proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

In the event of foreclosure of this Security Instrument or other transfer of title to the Property that extinguishes the indebtedness, all right, title and interest of Borrower in and to insurance policies in force shall pass to the purchaser.

5. **Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument (or within sixty days of a later sale or transfer of the Property) and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that requirement will cause undue hardship for Borrower, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall notify Lender of any extenuating circumstances. Borrower shall not commit waste or destroy, damage or substantially change the Property or allow the Property to deteriorate, reasonable wear and tear excepted. Lender may inspect the Property if the Property is vacant or abandoned or the loan is in default. Lender may take reasonable action to protect and preserve such vacant or abandoned Property. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and fee title shall not be merged unless Lender agrees to the merger in writing.

6. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in place of condemnation, are hereby assigned and shall be paid to Lender to the extent of the full amount of the indebtedness that remains unpaid under the Note and this Security Instrument. Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts applied in the order provided in paragraph 3, and then to prepayment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments, which are referred to in paragraph 2, or change the amount of such payments. Any excess proceeds over an amount required to pay all outstanding indebtedness under the Note and this Security Instrument shall be paid to the entity legally entitled thereto.

7. **Charges to Borrower and Protection of Lender's Rights in the Property.** Borrower shall pay all governmental or municipal charges, fines and impositions that are not included in paragraph 2. Borrower shall pay these obligations on time directly to the entity which is owed the payment. If failure to pay would adversely affect Lender's interest in the Property, upon Lender's request Borrower shall promptly furnish to Lender receipts evidencing these payments.

If Borrower fails to make these payments or the payments required by paragraph 2, or fails to perform any other covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, for condemnation or to enforce laws or regulations), then Lender may do and pay



2000-047256     Ingham County MI Register of Deeds     Page 2 of 5

FHA Michigan Mortgage -     Initials: CKM   MIVFHADE

**LOAN #: 612077750**

whatever is necessary to protect the value of the Property and Lender's rights in the Property, including payment of taxes, hazard insurance and other items mentioned in paragraph 2.

Any amounts disbursed by Lender under this paragraph shall become an additional debt of Borrower and be secured by this Security Instrument. These amounts shall bear interest from the date of disbursement, at the Note rate, and at the option of Lender, shall be immediately due and payable.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

**8.  Fees.** Lender may collect fees and charges authorized by the Secretary.

**9.  Grounds for Acceleration of Debt.**

    **(a) Default.** Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:

        (i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or

        (ii) Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

    **(b) Sale Without Credit Approval.** Lender shall, if permitted by applicable law (including Section 341(d) of the Garn-St. Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j-3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:

        (i) All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and

        (ii) The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property but his or her credit has not been approved in accordance with the requirements of the Secretary.

    **(c) No Waiver.** If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

    **(d) Regulations of HUD Secretary.** In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

    **(e) Mortgage Not Insured.** Borrower agrees that if this Security Instrument and the Note are not determined to be eligible for insurance under the National Housing Act within 60 days from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to 60 days from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

**10.  Reinstatement.** Borrower has a right to be reinstated if Lender has required immediate payment in full because of Borrower's failure to pay an amount due under the Note or this Security Instrument. This right applies even after foreclosure proceedings are instituted. To reinstate the Security Instrument, Borrower shall tender in a lump sum all amounts required to bring Borrower's account current including, to the extent they are obligations of Borrower under this Security Instrument, foreclosure costs and reasonable and customary attorneys' fees and expenses properly associated with the foreclosure proceeding. Upon reinstatement by Borrower, this Security Instrument and the obligations that it secures shall remain in effect as if Lender had not required immediate payment in full. However, Lender is not required to permit reinstatement if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceeding, (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument.

**11.  Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time of payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successor in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

**12.  Successors and Assigns Bound; Joint and Several Liability; Co-Signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 9(b). Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

**13.  Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

**14.  Governing Law; Severability.** This Security Instrument shall be governed by Federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

**15.  Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**16.  Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal

FHA Michigan Mortgage -

Initials: _CKM_
MIVFHADE

LOAN #: 612077750

or other remediation of any Hazardous Substances affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 16, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this paragraph 16, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**17. Foreclosure Procedure. If Lender requires immediate payment in full under paragraph 9, Lender may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 17, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in paragraph 13. Lender shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by applicable law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under paragraph 9, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 *et seq.*) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this paragraph 17 or applicable law.

**18. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument without charge to Borrower.

**19. Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.
[Check applicable box(es)].

☐ Condominium Rider  ☐ Growing Equity Rider  ☐ Graduated Payment Rider
☐ Planned Unit Development Rider  ☐ Other [specify]

BY SIGNING BELOW, Borrower accepts and agrees to the terms contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Witnesses:

_____
KIMBERLY D. KOLESKI

_____
CHERYL L. EDWARDS

_____
COLLEEN KAY MURRAY
AKA COLLEEN K. MURRAY

STATE OF MICHIGAN,  County ss: EATON

The foregoing instrument was acknowledged before me this ___OCTOBER 16, 2000___
(date)

by __COLLEEN KAY MURRAY  AKA COLLEEN K. MURRAY__

_____
(person acknowledging)

My Commission Expires:

KIMBERLY D. KOLESKI, NOTARY PUBLIC
SHIAWASSEE COUNTY, STATE OF MICHIGAN
ACTING IN EATON COUNTY, MICHIGAN
MY COMMISSION EXPIRES 10-8-2002

_____
Notary Public,

_____
County, Michigan

FHA Michigan Mortgage - 4/96

2000-047256
Page: 4 of 5
11/06/2000 10:19A

MIVFHADE

UNOFFICIAL COPY

File Number: 33-0018210

LOT 407, MAPLE HILL, CITY OF LANSING, INGHAM COUNTY, MICHIGAN ACCORDING TO THE RECORDED PLAT THEREOF AS RECORDED IN LIBER 8 OF PLATS, PAGE 33, INGHAM COUNTY RECORDS.

P.P. #3301-34-154-001-9



2000-047256
Page: 5 of 5
11/06/2000 10:19A